## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **DR. TONE JOHNSON,** | § | |
| **COMPLETE MEDICAL CARE, P.C.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. C-06-138** |
| **v.** | § | |
| | § | |
| **CHRISTUS SPOHN, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION & ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (Dkt. No. 92). Having considered the motion, the responses thereto, the entire record and the applicable law, the Court is of the opinion the motion should be granted.

### Factual Background[1]

Plaintiff Tone Johnson, M.D. ("Johnson"), is an African-American physician with a general family practice in Corpus Christi, Texas. Plaintiff Complete Medical Care, P.C. ("Complete Medical") is Dr. Johnson's wholly-owned professional corporation. Plaintiffs filed their initial complaint (Dkt. No. 1) in the above-captioned civil action in March 2006 against the Christus Spohn Health System Corporation ("Christus Spohn"), Christus Spohn Hospital Corpus Christi-South (the "Hospital") and various individual administrators and physicians who comprised the Christus Spohn Medical Executive Committee[2] ("Medical Executive Committee") (collectively, "Defendants") for suspending, and

---

[1] Plaintiffs have filed numerous objections to Defendants' summary judgment evidence. *See* Dkt. No. 103. To the extent the Court regards those portions of the evidence as necessary to the resolution of particular summary judgment issues, it has ruled on the objections to that evidence and noted those rulings in this order. Plaintiffs' remaining evidentiary objections are denied as moot.

[2] Defendant Mike Johnson ("Johnson") is an administrator at Christus Spohn. Defendants Drs. Drake Beauchamp ("Beauchamp"), David Blanchard ("Blanchard"), Gerard Boynton ("Boynton"), Lawrence Brenner ("Brenner"), Cecil Childers ("Childers"), Wilber Cleaves ("Cleaves"),  Daniel Doucet ("Doucet"), Rick Edwards

recommending the ultimate termination of, Dr. Johnson's privileges to practice medicine at several Christus Spohn facilities in March 2004 following the death of a patient ("RM") who had been in Dr. Johnson's care.

The Court notes certain details regarding Dr. Johnson's care for RM are disputed. The primary issues surrounding Defendants' Motion for Summary Judgment (Dkt. No. 92), however, are not whether Dr. Johnson competently treated RM or whether Dr. Johnson's acts or omissions were sufficiently negligent to warrant a revocation of his privileges. The principal issues presented here are whether Defendants conducted their peer review process appropriately under the controlling legal standards discussed below. The Court's focus is thus not on the events of March 15-19, 2004, but rather on the disciplinary procedures that followed. For background purposes, however, the facts surrounding Dr. Johnson's care for RM are summarized below.

On March 15, 2004, Dr. E. Reveron ("Dr. Reveron"), an agent of Dr. Johnson and employee of Complete Medical, examined RM.[3] Based on Dr. Reveron's initial observations, he suspected RM contracted varicella (commonly known as chicken pox) and ordered various tests including a white blood count lab.[4] On March 16, 2004, Dr. Reveron received the lab results which indicated RM had a

---

("Edwards"), Noe Lira ("Lira"), J.M. McCullough ("McCullough"), Thomas Morris ("Morris"), John Navar ("Navar"), Nestor Praderio ("Praderio"), Deanna Reynolds ("Reynolds"), Stephen Rush ("Rush"), Salim Surani ("Surani"), Thomas Townsend Jr. ("Townsend") and Daniel Vijjeswarapu ("Vijjeswarapu") are members of the Medical Executive Committee that reviewed the medical care given by Dr. Johnson.

[3] Dkt. No. 45 at p.12; *see also* Timeline & Affidavits, Dkt. No. 92, Ex. B ("Timeline & Affidavits"). Plaintiffs object to the Timeline as not sworn to on personal knowledge. However, Defendants provide the affidavits of seven physicians, nurses and hospital employees who were involved with Dr. Johnson's treatment of RM. Each affiant provides relevant testimony to specific portions of the Timeline. The combined effect of these affidavits, each of which is based on personal knowledge (and not "information and belief" as Plaintiffs contend), is sufficient to overcome Plaintiffs' objection. Plaintiffs also object to the Timeline on the ground that it contains hearsay. However, the Timeline is admissible for the non-hearsay purposes of showing what evidence various peer review committees considered and whether the committee members reasonably believed they were acting to further quality healthcare. These considerations are relevant to whether Defendants are entitled to immunity from damages under both federal and state law as discussed below. Therefore, Plaintiffs' objections to the Timeline & Affidavits are overruled.

[4] *Id.*

low white blood count and high fever.[5]   Defendants assert these lab results indicated RM's immune system had been "severely compromised."[6]  Dr. Reveron ordered RM to go to the Hospital for admission immediately.[7]  Dr. Reveron enjoyed no privileges at the Hospital, and thus admitted RM "through Dr. Johnson" at approximately 10:00 a.m. on March 16, 2004.[8]  Dr. Reveron informed Dr. Johnson of RM's lab results and status.[9]  RM was admitted with a primary diagnosis of viremia (a medical condition in which a virus has entered the bloodstream).[10]

Dr. Johnson appeared at the Hospital on the evening of March 16, 2004 and reviewed RM's chart.[11]  Although aware of RM's status and test results, the record indicates Dr. Johnson did not examine the patient directly.[12]   Defendants allege Dr. Johnson did not personally see RM until the evening of March 17, 2004 despite his being present at the Hospital and being aware of RM's lab results a day earlier.[13]  Despite RM's low white blood count, once admitted to the Hospital, RM did not receive a hematology consult regarding his condition until late the following evening.[14]  Although it appears Dr. Reveron ordered such a consult when he initially admitted RM, Dr. Johnson—RM's primary physician

---

[5] *Id.*; *see also* Dkt. No. 92 at p.5.

[6] Dkt. No. 92 at p.5.

[7] Timeline & Affidavits; Dkt. No. 45 at p.12.

[8] Timeline & Affidavits; Dkt. No. 45 at pp.12-13.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] Timeline & Affidavits; Dkt. No. 45 at pp.13-14*;* Dkt. No. 92 at p.5.

[13] Dkt. No. 92 at pp.5-6.

[14] Timeline & Affidavits; Dkt. No. 45 at pp.13-15; *id.*

at the Hospital—neither called a consulting doctor nor ensured a consult was carried out.[15]

Shortly after midnight on March 17, 2004, RM suffered a seizure.[16]  Hospital nurses informed Dr. Johnson of RM's status and Defendants claim Dr. Johnson gave the nurses no orders.[17]  On the morning of March 17, 2004, at approximately 9:00 a.m., Dr. Johnson requested Hospital nurses contact several hematologists and neurologists for consults.[18]  Several of the requested consultants did not come to the Hospital.[19]  While the nurses had a difficult time finding available consulting physicians, sometime in the mid-morning of March 17, 2004, Dr. Yvonne Manalo ("Dr. Manalo"), a hematologist, and Dr. David McFarling ("Dr. McFarling"), a neurologist, were contacted.[20]  Dr. Manalo did not arrive at the hospital until sometime between 6:00-7:00 p.m.[21]

Concerned over her husband's treatment at the Hospital, on the afternoon of March 17, 2004, RM's wife contacted the Hospital Assistant Administrator, Leslie Gembol, who in turn contacted Dr. J.M. McCullough ("Dr. McCullough").[22]  Dr. McCullough, a family practitioner and member of the Hospital's medical staff, contacted the head of the Hospital's family practice department, Dr. Wilbur

---

[15] *Id.*  The record indicates Dr. Reveron ordered a hematology consult. *Id.*  Defendants do not dispute this, but rather note Dr. Johnson, as the physician who enjoyed privileges as Christus Spohn and was thus RM's primarily responsible doctor, neither personally ordered a hematology consult nor checked that one had been administered. Dkt. No. 92 at p.5.  Defendants assert Dr. Johnson, "clearly knew or should have known (or could have easily ascertained) that no such consult or doctor's examination had occurred." *Id.*  Plaintiffs contend the consult was not carried out in a timely manner because of errors by the Hospital staff.  Aff. of Dr. Johnson at pp.2-4, Dkt. No. 102, Ex. 1.  Despite the parties' differing views of how this situation came to be, it is not disputed that RM did not receive a timely hematology consult.

[16] Timeline & Affidavits; Dkt. No. 45 at p.14; Dkt. No. 92 at p.5.

[17] Timeline & Affidavits; Dkt. No. 45 at p.14.  Dr. Johnson claims to have requested a neurology consult at this time.  Dkt. No. 45 at p.14.

[18] Timeline & Affidavits; Dkt. No. 45 at p.14.

[19] *Id.*

[20] *Id.*

[21] Timeline & Affidavits; Dkt. No. 45 at p.16.

[22] Timeline & Affidavits; Dkt. No. 45 at pp.14-17; Dkt. No. 92 at pp.5-6.

Cleaves ("Dr. Cleaves").[23]  At sometime between 3:00-4:00 p.m., Dr. Cleaves contacted Dr. Johnson and informed him RM's wife was particularly upset regarding her husband's care.[24]  According to Defendants, Dr. Johnson responded to Dr. Cleaves' phone call by filing a complaint claiming he was being singled out based on his race and asserting RM and his wife were "2x stupid."[25]  Defendants also claim that during RM's hospitalization Dr. Johnson made other disparaging remarks about the patient's family, at one point hung up the phone on the patient and labeled the couple "drug seekers."[26]

Sometime between 6:00-7:00 p.m. on March 17, 2004, Dr. Manalo arrived to provide a hematology consult.[27]  At approximately 7:00 p.m., Dr. Johnson arrived to examine RM.[28]  Dr. Manalo

---

[23] *Id.*

[24] *Id.*

[25] Timeline & Affidavits; Service Recovery Form (Mar. 17, 2004), Dkt. No. 92, Ex. F.  Plaintiffs object to the Service Recovery Form on the grounds that it is not based on personal knowledge and contains hearsay evidence. However, the affidavit of Carol Ann Arnall, a hospital secretary, provides personal knowledge for the Service Recovery Form's content.  Aff. of Carol Ann Arnall, Dkt. No. 92, Ex. B.  Dr. Richard Davis ("Davis"), Vice President of Medical Affairs, authenticated the Service Recovery Form as a true and correct copy of the original and as a business record of regularly conducted business activities made by a person with knowledge or from information transmitted by a person with knowledge.  *See* Aff. of Dr. Davis ¶¶1, 23, Dkt. No. 92, Ex. A; Suppl. Aff. of Dr. Davis ¶3, Dkt. No 104, Ex. C; FED. R. EVID. 803(6).  Moreover, Dr. Johnson's statements are statements by a party opponent and constitute present sense impressions of contemporaneous events.  FED. R. EVID. 801(d), 803(1).  Like the Timeline & Affidavits, the Service Recovery Form is also admissible for the non-hearsay purposes of showing what the various committees considered and whether the committee members reasonably believed they were acting to further quality healthcare.  As stated above, these considerations are relevant to whether Defendants are entitled to immunity from damages.  Therefore, Plaintiffs' objections to the Service Recovery Form are overruled.

Plaintiffs also object to Dr. Davis' authentication of documents, including the Service Recovery Form, in paragraph 23 of his first affidavit as lacking personal knowledge and containing hearsay.  First, Dr. Davis' affidavit plainly states the entire document is based on personal knowledge.  *See* Aff. of Dr. Davis ¶1.  Second, Dr. Davis' role as the Hospital's representative during the peer review proceedings and his knowledge regarding the process make it reasonable to infer he had personal knowledge of these documents.  Moreover, many of the documents authenticated as true and correct original copies have been identified by Dr. Davis' supplemental affidavit as business records of regularly conducted business activities made by a person with knowledge or from information transmitted by a person with knowledge.  Suppl. Aff. of Dr. Davis ¶3; FED. R. EVID. 803(6).  Plaintiffs objections to Dr. Davis' authentication of documents are thus overruled.

[26] Timeline & Affidavits; Dkt. No 92 at pp.5-6.  Dr. Johnson's supposed belief that RM and his wife were "drug seekers" allegedly stems from a prior dispute between Dr. Johnson and the patient's wife, in which Dr. Johnson refused to prescribe her pain medication in connection to an apparently unrelated treatment.  *See* Dkt. No. 92 at p.6.

[27] Timeline & Affidavits; Dkt. No. 45 at pp.14-17; Dkt. No. 92 at pp.5-6.

[28] *Id.*

assessed the patient and either he or Dr. Johnson ordered RM be transferred to the intensive care unit

("ICU").[29]  Within two hours, RM was intubated and placed on a ventilator.[30]  Although it is not entirely

clear, it appears that at some point following RM's transfer to the ICU, Dr. Johnson was removed as

RM's physician based on a request from RM's wife.[31]  Once in the ICU, RM was seen by various

specialists.[32]  Despite the attention given to RM during his stay in the ICU, he passed away at

approximately 9:00 a.m. on March 19, 2004.[33]

The Hospital's Medical Executive Committee held its regularly-scheduled meeting on March

25, 2004.[34]  After hearing reports from Dr. McCullough and Dr. Gerard Boynton ("Dr. Boynton"),[35] the

Medical Executive Committee voted to summarily suspend Dr. Johnson's staff membership and appoint

a Departmental Action Committee comprised of physicians from the Department of Family Practice to

investigate Dr. Johnson's alleged misconduct and report its findings to the Medical Executive

---

[29] *Id.*  Defendants claim Dr. Manalo ordered RM be transferred to the ICU.  *Id.*  Dr. Johnson claims he issued the order.  Aff. of Dr. Johnson, Dkt. No. 102, Ex. 1 at p.6.

[30] Timeline & Affidavits; Dkt. No. 45 at pp.16-17.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] Dr. Ray Acebo ("Acebo"), the Hospital Chief of Staff, and Drs. Beauchamp, Blanchard, Boynton, Brenner, Childers, Doucet, Edwards, Lira, McCullough, Morris, Navar, Praderio, Reynolds, Rush, Surani, Townsend and Vijjeswarapu were in attendance.  Medical Executive Committee March 25, 2004 Attendance and Minutes, Dkt. No. 92, Ex. G.  Plaintiffs object to the Medical Executive Committee Attendance and Minutes on the grounds they are not sworn to on personal knowledge and contain hearsay.  However, Dr. Davis authenticated the minutes as a true and correct copy of the original and as a business record of regularly conducted business activities.  *See* Aff. of Dr. Davis ¶¶1, 23, Dkt. No. 92, Ex. A; Suppl. Aff. of Dr. Davis ¶3, Dkt. No 104, Ex. C; FED. R. EVID. 803(6).  The March 25, 2004 Attendance and Minutes are also admissible for the non-hearsay purposes of showing what evidence the Medical Executive Committee considered, what actions were taken by Defendants, whether the procedures taken were fair and whether the committee members reasonably believed they were acting to further quality healthcare.  Moreover, Dr. McCullough stated in an affidavit that he appeared before and made statements to the Medical Executive Committee on March 25, 2004.  Aff. of Dr. McCullough, Dkt. No. 92, Ex. FFF.  Therefore, the Court overrules Plaintiffs' objections to the March 25, 2004 Medical Executive Committee Attendance and Minutes.

[35] It is not clear from the record what Dr. Boynton's report contained.  Dr. Boynton is a family practitioner who enjoys privileges at the Hospital.  *See* Dkt. No. 45 at p.3  However, his role in RM's treatment and the substance of what he reported to the Medical Executive Committee remain unknown.

Committee.[36]   Although absent from the meeting, Dr. Cleaves provided input by way of a "recommendation" to the Medical Executive Committee.[37]   The Medical Executive Committee had numerous members and no one member had the power to veto or otherwise overwhelm the majority vote.[38]   The Medical Executive Committee notified Dr. Johnson of its decision the same day and informed him that a Departmental Action Committee would investigate the matter and that he would be given notice of the committee's meeting and an opportunity to "discuss, explain or refute the issues raised" via an "interview."[39]   The letter notifying Dr. Johnson of his suspension explained "[t]his summary suspension is an interim precautionary action" and the Departmental Action Committee meeting interview would be "preliminary in nature."[40]

Pursuant to Dr. Johnson's request, the Medical Executive Committee[41] reconvened on April 1,

---

[36] Medical Executive Committee March 25, 2004 Attendance and Minutes.

[37] *Id.* (stating "the Medical Executive Committee was in agreement with the recommendation of [Dr. Cleaves]").

[38] Aff. of Dr. Davis ¶5; Dep. of Dr. Acebo at p.43 (July 10, 2007), Dkt. No. 92, Ex. J. Plaintiffs object to the second sentence of paragraph 5 of Dr. Davis' affidavit arguing it is conclusory, contains hearsay, fails to comply with the best evidence rule and is not based on personal knowledge.   As noted above, Dr. Davis' affidavit establishes his statements are based on personal knowledge, and as Vice President of Medical Affairs, it is reasonable to infer Dr. Davis had personal knowledge of this meeting and its procedures.   *See* Aff. of Dr. Davis ¶¶1-2.  Plaintiffs' hearsay and best evidence objections are similarly unpersuasive.   The objected-to sentence only refers to actions taken by Defendants—not statements made therein.   Second, Defendants do not attempt to use this portion of Dr. Davis' affidavit to prove the content of any document; rather, they look to Dr. Davis' affidavit for support of the general structure of the events that occurred during Dr. Johnson's peer review.  Thus, Plaintiffs objections to the second sentence of paragraph five of Dr. Davis' affidavit are overruled.

[39] Letter from Acebo to Johnson (Mar. 25, 2004), Dkt. No. 92, Ex. I. Plaintiffs object to the Letter from Acebo to Johnson. Like their previous objections, Plaintiffs claim the letter is not sworn to on personal knowledge and contains hearsay.   However, as noted above, Dr. Davis authenticated the letter as a true and correct copy of the original and as a business record of regularly conducted business activities.   *See* Aff. of Dr. Davis ¶¶1, 23, Dkt. No. 92, Ex. A; Suppl. Aff. of Dr. Davis ¶3, Dkt. No 104, Ex. C; FED. R. EVID. 803(6); *see also* Letter from Acebo to Johnson at p.2 (bearing Dr. Johnson's signature as proof of his receipt of the letter).   The Letter is also admissible for the non-hearsay purposes of showing what actions were taken by Defendants and whether the procedures taken were fair.  Plaintiffs' objections to the Letter are overruled.

[40] *Id.*

[41] Drs. Acebo, Beauchamp, Blanchard, Boynton, Brenner, Childers, Cleaves, Edwards, Lira, McCullough, Morris, Navar, Praderio, Rush and Surani were present.   Medical Executive Committee April 1, 2004 Attendance and Minutes, Dkt. No. 92, Ex. M. Other Doctors, not named as defendants in this suit or otherwise relevant were also in attendance.  *Id.*   Dr. Davis, Vice President of Medical Affairs, and Ben Donnell ("Donnell"), the Hospital attorney, also

2004 to reconsider Dr. Johnson's suspension.[42]  After considering a timeline of the events surrounding RM's care and hearing a presentation by Dr. Johnson, the Medical Executive Committee voted to continue the suspension of Dr. Johnson's staff membership and clinical privileges pending the Departmental Action Committee's report and resolution of the peer review process.[43]

On April 7, 2004, a Departmental Action Committee[44] comprised of family practitioners convened and allowed Dr. Johnson to "discuss, explain or refute the issues raised."[45]  Dr. Johnson appeared, and through his interview, provided his position on the events underlying his suspension.[46] The Departmental Action Committee also heard from Dr. McCullough, Dr. Cleaves, Nikki Alviar (the Hospital's shift supervisor) and Danielle Chavez (the charge nurse present on March 16-18, 2004).[47] The Committee had access to RM's patient chart.[48]  The Departmental Action Committee ultimately voted to continue the summary suspension and recommend revocation of Dr. Johnson's medical staff

---

sat in on the meeting.  *Id.*  Plaintiffs object to the Medical Executive Committee April 1, 2004 Attendance and Minutes on the same grounds raised regarding the March 25, 2004 Medical Executive Committee Meeting Attendance and Minutes.  The Court overrules Plaintiffs' objections based on the reasoning above.  *See*, *supra*, n.34.

[42] Letter from Johnson to Acebo (undated), Dkt. No. 92, Ex. K; Aff. of Dr. Davis ¶6.

[43] Dkt. No. 45 at p.18; Medical Executive Committee April 1, 2004 Attendance and Minutes.

[44] Several family practitioners not named as defendants served as part of the Departmental Action Committee. Departmental Action Committee April 7, 2004 Attendance and Minutes, Dkt. No. 92, Ex. P.  Dr. Cleaves also served as part of the Departmental Action Committee but abstained from voting.  *Id.*; Aff. of Dr. Cleaves ¶2 (Oct. 5, 2004), Dkt. No. 92, Ex. Q.  Present "as a resource" were Dr. Davis and Mr. Donnell, but neither individual participated in the presentation of the case against Dr. Johnson or the decision making process.  Departmental Action Committee April 7, 2004 Attendance and Minutes.  Plaintiffs object to the Departmental Action Committee April 7, 2004 Attendance and Minutes on the grounds they are not sworn to or otherwise authenticated by personal knowledge.  However, as with Plaintiffs' similar objections regarding the various committee meeting minutes, Plaintiffs' objections are unavailing. *See*, *supra*, n.34, 41.  Plaintiffs' objections are thus overruled.

[45] Departmental Action Committee April 7, 2004 Attendance and Minutes.

[46] *Id.*; Aff. of Dr. Cleaves ¶7.

[47] Departmental Action Committee April 7, 2004 Attendance and Minutes.

[48] *Id.*

8

membership and clinical privileges.[49]

Fifteen days later, in its executive session, the Medical Executive Committee[50] adopted the Departmental Action Committee's report and recommendations and itself recommended the Christus Spohn Board of Directors ("Board of Directors") revoke Dr. Johnson's medical staff membership and clinical privileges.[51] The Medical Executive Committee notified Dr. Johnson of its action and informed him of his right to request a formal hearing before the Board of Directors considered the Medical Executive Committee's recommendation.[52] Soon thereafter, Christus Spohn sent notice of Dr. Johnson's interim suspension to the National Practitioner Data Bank because the interim suspension exceeded 30 days.[53]

Dr. Johnson then requested a fair hearing before a Medical Peer Review Hearing Committee ("Fair Hearing Committee").[54] The Fair Hearing Committee held several hearings in July and September of 2004 (along with numerous pre-hearing conferences) but resigned before completing the

---

[49] *Id.*

[50] In attendance were Drs. Acebo, Beauchamp, Boynton, Brenner, Childers, Cleaves, Lira, McCullough, Morris, Navar, Praderio, Reynolds, Rush, Surani and Townsend. Medical Executive Committee April 22, 2004 Attendance and Minutes, Dkt. No. 92, Ex. R. Other Doctors, not named as defendants in this suit or otherwise relevant were also in attendance. *Id.* Plaintiffs object to the Medical Executive Committee April 22, 2004 Attendance and Minutes on the same grounds raised regarding the March 25, 2004 and April 1, 2004 Medical Executive Committee Attendance and Minutes and similar grounds raised as to the Departmental Action Committee April 7, 2004 Attendance and Minutes. Plaintiffs' objections are overruled based on the reasoning provided above. *See*, *supra*, n.34, 41 & 44.

[51] Medical Executive Committee April 22, 2004 Attendance and Minutes.

[52] Second Letter from Acebo to Johnson (Apr. 26, 2004), Dkt. No. 92, Ex. S. Plaintiffs object to the Second Letter from Acebo to Johnson on the grounds raised regarding the March 25, 2004 Letter from Acebo to Johnson. The Court again overrules Plaintiffs' objections. *See*, *supra*, n.39.

[53] Aff. of Dr. Davis ¶9; 42 U.S.C. § 11133(a)(A); *see also* U.S. Department of Health and Human Services, *National Practitioner Data Bank Guidebook*, Pub. No. HRSA-95-255 at Ch. E (Sep. 2001), *available at* http://www.npdb-hipdb.hrsa.gov/npdbguidebook.html (requiring the filing of an adverse action report with the National Practitioner Data Bank for any professional review action that adversely affects a physician's privileges for more than 30 days).

[54] Flores Letter to Acebo and Administrator (May 13, 2004), Dkt. No. 92, Ex. T.

9

hearing or announcing a decision.[55]  A second Fair Hearing Committee[56] held hearings on April 26, May

11, May 23 and July 6, 2005.[57]  At each of the above-mentioned hearings, Dr. Johnson appeared with

counsel, presented testimony and other evidence and called and cross-examined witnesses.[58]

On July 14, 2005, the second Fair Hearing Committee unanimously agreed Dr. Johnson failed

to carry his burden of showing the Medical Executive Committee's decision to revoke his staff

membership and clinical privileges lacked "substantial factual basis" or "such basis and the conclusions

drawn therefrom [were] arbitrary, unreasonable, or capricious."[59]  Fourteen days later, after notifying

Dr. Johnson it would again meet, the Medical Executive Committee[60] voted to affirm its

recommendation that the Board of Directors revoke Dr. Johnson's staff membership and clinical

privileges.[61]  Dr. Johnson was notified of the vote and requested an appeal of the Medical Executive

Committee's decision.[62]

On November 1, 2005, the Appellate Review Body[63] unanimously voted to recommend that the

---

[55] July 22, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. X; September 23, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. AA.

[56] The second Fair Hearing Committee members included Drs. William Burgin, Edgar Cortes, Randy Fuentes, Bruce Gibson and Richard Porter, none of whom are included as defendants in this suit.  April 26, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. OO; May 11, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. QQ; May 23, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. TT; and July 6, 2005 Fair Hearing Transcript, Dkt. No. 92, Ex. UU.

[57] *Id.*

[58] *Id.*

[59] Second  Fair Hearing Committee Report, Dkt. No. 92, Ex. VV.

[60] Present were Drs. Beauchamp, Boynton, Brenner, Childers, Edwards, McCullough, Morris, Navar, Praderio, Reynolds and Surani. Medical Executive Committee July 28, 2005 Attendance and Minutes, Dkt. No. 92, Ex. XX.  Other Doctors, not named as defendants in this suit or otherwise relevant were also in attendance.  *Id.*

[61] *Id.*

[62] Flores Letter to Alsup (Aug. 1, 2005), Dkt. No. 92, Ex. YY.

[63] The Appellate Review Body was comprised of Jerry Bell, David Engel, Clayton Houser, Colleen McHugh, Patty Mueller and Kirby Townsend.  Appellate Review Body Transcript (Oct. 31, 2005), Dkt. No. 92, Ex. BBB.

Board of Directors affirm the Fair Hearing Committee's decision.[64]  After hearing oral argument from

the Hospital and Dr. Johnson's counsel, the Appellate Review Body concluded that:

> (a) this matter has been handled in substantial compliance with the Hospital Bylaws, (b) the decision of the hearing committee was based upon the evidence presented to it, and (c) the hearing committee decision was reasonable in light of the hospital's duty to its patients.

> Specifically, the Appellate Review Body believes that (i) Dr. Johnson was provided a full opportunity to present to the hearing committee all witnesses and documentation in support of his position, (ii) Dr. Johnson received a fair hearing and procedural due process as contemplated by the Bylaws and federal and state law, (iii) Dr. Johnson's behavior and actions at issue in the matter result in serious quality of care concerns for the patients of this hospital, (iv) there is no evidence that the hearing committee decision was in any way based on or resulted from Dr. Johnson's race, and (v) under the circumstances there is clearly a reasonable basis for the summary suspension.

Hoover Letter to McDonagh (Nov. 1, 2005), Dkt. No. 92, Ex. CCC.

Finally, on November 18, 2005, the Board of Directors met and voted to affirm the Medical

Executive Committee's decision to revoke Dr. Johnson's membership and privileges.[65]  The Hospital

reported the action to the National Practitioner Data Bank.[66]

Plaintiffs' live complaint (Dkt. No. 45) alleges thirteen causes of action arising out of Dr.

Johnson's suspension, including various state and federal antitrust violations, breach of contract, and

various state torts including business disparagement, defamation, tortious interference with contract,

intentional infliction of emotional distress, fraud and misrepresentation.[67]  Plaintiffs allege Defendants

conspired to wrongfully cause the peer review investigation into Dr. Johnson's competence, the entire

---

[64] Hoover Letter to McDonagh (Nov. 1, 2005), Dkt. No. 92, Ex. CCC.  Plaintiffs object to the Hoover Letter on the grounds it contains hearsay within hearsay, has not been sworn to and is not based on personal knowledge.  Like the Court's rulings on similar issues above, Plaintiffs' objections are overruled because Dr. Davis authenticated the Hoover Letter and testified it was a business record and the Hoover Letter is otherwise admissible for non-hearsay purposes.  *See*, *supra*, n.34, 41, 44 & 50.

[65] Townsend Letter to Johnson (Nov. 18, 2005), Dkt. No. 92, Ex. DDD.

[66] *Id.*

[67] *See* Dkt. No. 45.

proceedings departed from the standards set forth in the Federal Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101 *et seq.*, and, throughout the proceedings, Dr. Johnson was subject to disparate treatment based on his race.  Dr. Johnson also contends Defendants are liable under 42 U.S.C. § 1981 for such race-based discrimination.  Furthermore, Plaintiffs seek a declaratory judgment from this Court finding that the HCQIA preempts its Texas counterpart, the Texas Health Care Quality Improvement Act ("THCQIA"), TEX. OCC. CODE ANN. § 160.010(1) (Vernon 2001), and that the THCQIA violates the "open courts" provision of the Texas Constitution.

Defendants seek summary judgment as to each claim against them.  Defendants contend the HCQIA and THCQIA immunize them from liability as to all claims brought except for Dr. Johnson's race discrimination claim.  Defendants also assert Dr. Johnson fails to raise a triable issue of fact that Defendants engaged in race-based discrimination or that the suggested reason for terminating Dr. Johnson's privileges—substandard care for RM—was a mere pretext for Defendants' discriminatory actions.

## Standard of Review

A summary judgment shall be issued if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Hall v. Thomas*, 190 F.3d 693, 695 (5th Cir. 1999).  In considering a motion for summary judgment, the court construes factual controversies in the light most favorable to the non-movant, but only if both parties have introduced evidence showing that an actual controversy exists. *Lynch Properties, Inc. v. Potomac Ins. Co. of Illinois*, 140 F.3d 622, 625 (5th Cir. 1998).  The burden is on the movant to convince the court that no genuine issue of material fact exists as to the claims asserted by the non-movant, but the movant is not required to negate elements of the non-movant's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The non-moving party may not rest solely on its pleadings. *King v. Chide*, 974 F.2d 653, 656 (5th Cir. 1992). For issues on which the non-movant will bear the burden of proof at trial, that party must produce summary judgment evidence and designate specific facts which indicate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322-23; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet its burden, the non-moving party must present "significant probative" evidence indicating that there is a triable issue of fact. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994). If the evidence rebutting the summary judgment motion is only colorable or not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51. (1986).

### Discussion

## I. Immunity Under Federal Law for Peer Review Actions

Defendants seek to immunize their decision to suspend, and ultimately to recommend revocation of, Dr. Johnson's membership and privileges by relying on the HCQIA, 42 U.S.C. § 11101 *et seq.* The HCQIA was enacted to allow for effective peer review and nation-wide monitoring of incompetent physicians. *Van v. Anderson, M.D.*, 199 F. Supp. 2d 550, 570 (N.D. Tex. 2002) (citing *Austin v. McNamara, M.D.*, 979 F.2d 728, 733 (9th Cir. 1992)). The HCQIA provides qualified immunity for peer review participants to further these goals. *Id.* Specifically, the HCQIA limits the availability of damages for wrongs allegedly committed during professional review actions.[68] *See Monroe v. AMI*

---

[68] A "professional review action" is defined as "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges . . . of the physician." 42 U.S.C. § 11151(9). The entities protected under the HCQIA include the professional review body, any person acting as a member or staff to the body, any person under contract or agreement with the body and any person who participates with or assists the body with respect to the action. 42 U.S.C. § 11111(a)(1).

It is beyond dispute that the actions and parties here fall within the HCQIA's purview. The challenged action

*Hosps. of Tex., Inc.*, 877 F. Supp 1022, 1025 (S.D. Tex. 1994). "Hospitals and persons participating in professional review activities that meet the standards imposed by 42 U.S.C. § 11112 'shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.'" *Id.* (quoting 42 U.S.C. § 11111(a)). Thus, if the requirements set out in 42 U.S.C. § 11112 are met, Defendants would be provided a complete defense against all of Plaintiffs' claims save Dr. Johnson's section 1981 discrimination claim, as section 1981 claims are specifically exempted from HCQIA protection. 42 U.S.C. § 11111(a)(1).

The HCQIA creates a rebuttable presumption of immunity, providing "[a] professional review action shall be presumed to have met the preceding standards necessary for the protection set out in Section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence." 42 U.S.C. § 11112(a). This rebuttable presumption creates an "unusual" summary judgment standard: "'whether [the plaintiff] provided sufficient evidence to permit a jury to find that he ha[d] overcome, by a preponderance of the evidence, the presumption that [the defendants'] would reasonably have believed' that they had met the standards of section 11112(a)." *Bryan v. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333-34 (11th Cir. 1994) (quoting *McNamara*, 979 F.2d at 734). Thus, to rebut the HCQIA presumption of immunity, Plaintiffs must bring forth evidence that would allow a reasonable jury to conclude Defendants failed to comply with the motivation, investigation, notice, process and belief provisions set out by section 11112(a).

Section 11112(a) provides that, in order for the HCQIA to provide Defendants with immunity, the professional review action must have been taken:

(1) in the reasonable belief that the action was taken in furtherance of quality health care,

---

is the Medical Executive Committee's summary suspension and recommendation to revoke Dr. Johnson's privileges and the Defendants' are the various parties who participated in the review. Thus, the only question before the Court is whether the peer review process met the standards set forth in § 11112(a).

(2) after reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3) [above].

42 U.S.C. § 11112(a).

Notably, the HCQIA does not require the procedures referred to in section 11112(a)(3) either (1) "in the case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action" or (2) "precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual." 42 U.S.C. § 11112(c)(1)(B) & (c)(2).

In light of the standards laid out above, the Court must address whether Plaintiffs carried their burden to provide summary judgment evidence that would allow a reasonable jury to find, by a preponderance of the evidence, Defendants failed to meet the standards under section 11112(a) of the HCQIA.

### A.  Reasonable Belief the Action Furthered Quality Health Care

Plaintiffs contend they have rebutted the presumption Defendants were motivated by a reasonable belief the adverse peer review action furthered quality health care.  When examining the first prong of the HCQIA immunity test, courts have adopted an objective standard of reasonableness.  *See, e.g.*, *Van v. Anderson, M.D.*, 199 F. Supp. 2d 550, 571-72 (N.D. Tex. 2002) (collecting cases); *Bryan v. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1335 (11th Cir. 1994) (recognizing the good or bad faith of the peer reviewers is irrelevant and "[t]he real issue is the sufficiency of the basis for [the defendants'] decision").  Section 11112(a)(1) only requires "the reviewers, with the information available to them

15

at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Monroe v. AMI Hosps. of Tex., Inc.*, 877 F. Supp 1022, 1027 (S.D. Tex. 1994) (citing H.R. Rep. No. 903, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6393). Thus, the professional action taken focuses "not [on] whether the investigating committee's initial concerns are ultimately proved to be medically sound," but rather on whether the action taken was initiated by the reasonable belief that such action would further quality health care. *Van*, 199 F. Supp. 2d at 572; 42 U.S.C. § 11112(a)(1).

Here, there is ample evidence in the record indicating the summary suspension, peer review investigation and ultimate recommendation to revoke Dr. Johnson's privileges were prompted by the reasonable belief that taking such action would promote quality healthcare. Defendants instigated their suspension and peer review of Dr. Johnson's privileges in response to the allegedly incompetent treatment of a patient in his care. As noted above, the record additionally indicates Dr. Johnson made disparaging remarks about and/or to RM and his wife. Thus, the entire process of reviewing Dr. Johnson's care was prompted by legitimate concerns regarding his treatment of RM and the behavior associated with his allegedly substandard handling of the patient's case. *Cf. Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 496 (6th Cir. 2003) (observing "'quality healthcare' is not limited to clinical competence, but includes matters of general behavior" such as disruptive and unprofessional conduct towards patients and fellow hospital employees).

In Plaintiffs' Response to Defendants' Motion for Summary Judgment (Dkt. No. 102), Plaintiffs primarily assert that a lack of proper investigation and due process support their contention Defendants' actions were not taken in furtherance of quality health care. Although a lack of compliance with the procedures required under the HCQIA could arguably support the claim Defendants' actions were taken merely "to point an accusatory finger at Dr. Johnson," as addressed below, the Court finds Defendants'

investigation and procedures complied with the provisions of the HCQIA.

Plaintiffs also claim Defendants' personal biases or ulterior motives—based on personality conflicts, racial discrimination, obtaining an economic advantage by eliminating a competing physician and finding a scapegoat for what Plaintiffs characterize as the Hospital staff's negligent treatment of RM—suffice to overcome the presumption that Defendants' actions were motivated by the desire to provide quality health care. As stated above, the Court finds more than sufficient evidence in the record indicating the peer review was undertaken based on legitimate concerns over Dr. Johnson's acts and omissions. However, even assuming Plaintiffs could establish Defendants' prejudice or conspiratorial motivations, "[a]ssertions of animosity or bad faith are immaterial to the reasonableness standards of § 11112(a)." *Monroe*, 877 F. Supp. at 1028. Indeed, such evidence would not negate the fact Defendants' had an objectively reasonable motivation to review Dr. Johnson's treatment of RM.

The record shows that concerns about Dr. Johnson's professional competence and/or judgment in providing patient care were the impetus for Defendants' peer review, suspension and adverse recommendation. Thus, Plaintiffs fail to raise a fact issue as to whether Defendants' action complied with section 11112(a)(1). The Court must next evaluate whether Defendants' satisfied the three remaining provisions laid out by the HCQIA's section 11112(a).

**B. Reasonable Fact Gathering and Reasonable Belief Action Was Warranted**

To qualify for HCQIA immunity, Defendants must also have made reasonable efforts to obtain the relevant facts and acted upon a reasonable belief that their actions were warranted. 42 U.S.C. §§ 11112(a)(2) & (4). In evaluating these elements, the Court must consider whether the "totality of process" leading to the peer review action evidenced a reasonable effort to obtain the relevant facts underlying the adverse action. *Van*, 199 F. Supp. 2d at 572; 42 U.S.C. § 11112(a)(2); *see also Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 637 (3rd Cir. 1996) (observing the "totality of process" must

17

indicate a "reasonable effort to obtain the facts of the matter").  Moreover,  physicians are only entitled to a "reasonable investigation" under the HCQIA, "not a perfect investigation." *Egan v. Athol Mem'l Hosp.*, 971 F. Supp. 37, 43 (D. Mass. 1997) (citing *Sklaroff v. Allegheny Health Educ. Found.*, No. Civ. A. 95-4758, 1996 WL 383137, at *8 (E.D.Pa. July 8, 1996)).

The record reveals sufficient summary judgment evidence Defendants made a reasonable effort to obtain facts relating to Dr. Johnson's patient care and engaged in their peer review action in the reasonable belief their actions were warranted by the facts known.  Defendants' peer review process took almost two years to complete and allowed fact finding and review through four separate committees.  The Medical Executive Committee's first action—to summarily suspend Dr. Johnson's privileges on March 25, 2004 pending the outcome of further investigation into the matter—was taken after hearing the reports of Drs. McCullough and Boynton and upon the recommendation of Dr. Cleaves.[69]  As stated above, Drs. McCullough and Cleaves were familiar with Dr. Johnson's treatment of RM.  In response to Dr. Johnson's request, the Committee reconvened on April 1, 2004 and heard his position.[70]  Six days later, the Departmental Action Committee further investigated the matter.[71]  The Departmental Action Committee, which was comprised of family practitioners, heard presentations from Drs. Johnson, McCullough and Cleaves, shift supervisor Nikki Alviar and charge nurse Danielle Chavez.[72]  Moreover, the Committee had access to RM's patient chart.[73]  Dr. Johnson was allowed a hearing in front of a Fair Hearing Committee, which met numerous times and allowed Dr. Johnson,

---

[69] Medical Executive Committee March 25, 2004 Attendance and Minutes, Dkt. No. 92, Ex. G.

[70] Letter from Johnson to Acebo (undated), Dkt. No. 92, Ex. K; Medical Executive Committee April 1, 2004 Attendance and Minutes, Dkt. No. 92, Ex. M.

[71] Departmental Action Committee April 7, 2004 Minutes, Dkt. No. 92, Ex. P.

[72] *Id.*

[73] *Id.*

aided by an attorney, to present evidence and attempt to refute the allegations against him.[74]   Finally, Dr. Johnson unsuccessfully appealed the lower committees' findings (and the process through which they were made) to an Appellate Review Body.[75]

The Court finds unpersuasive Plaintiffs' argument the March 25, 2004 summary suspension was implemented without sufficient investigation into the underlying facts or a reasonable belief such an action was warranted by the facts then known.  The record indicates Dr. McCullough was sufficiently familiar with the underlying incident to competently report to the Medical Executive Committee on March 25, 2004.  Plaintiffs' claims that Dr. McCullough had a long standing personality dispute with Dr. Johnson and was motivated to find a scapegoat for RM's death, even if assumed true, do not overcome the presumption Defendants made a reasonable investigation into the facts essential to the summary suspension.  Again, courts analyzing section 11112(a)'s requirements apply an objective test, "so bad faith is immaterial." *Austin v. McNamara, M.D.,* 979 F.2d 728, 734 (9th Cir. 1992).  Dr. Cleaves, although not present at the March 25, 2004 meeting, recommended that Dr. Johnson be summarily suspended pending further investigation by the Departmental Action Committee.  It is undisputed Dr. Cleaves discussed the underlying events with Dr. Johnson over the telephone on March 17, 2004.  Furthermore, unlike other physician peer reviews, which often cover several instances of a doctor's alleged substandard care, the peer review action here stemmed from a single major incident which resulted in the death of Dr. Johnson's patient.  When the issue subject to peer review only concerns a single incident, summary suspension will inherently require less intensive fact finding and

---

[74] July 22, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. X; September 23, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. AA; Fair Hearing Resignation Letters, Dkt. No. 92, Ex. JJ; April 26, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. OO; May 11, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. QQ; May 23, 2004 Fair Hearing Transcript, Dkt. No. 92, Ex. TT; and July 6, 2005 Fair Hearing Transcript, Dkt. No. 92, Ex. UU.

[75] Appellate Review Body Transcript (Oct. 31, 2005), Dkt. No. 92, Ex. BBB.

data compilation than would be the case with a review of a physician's care over several years.  *See,*
*e.g.*, *Meyer v. Sunrise Hosp.*, 22 P.3d 1142, 1152 (Nev. 2001) ("Because the professional review action
was based on [the physician's] conduct arising from a single incident, a review of her other patients'
medical charts was unnecessary."); *cf. Poliner v. Tex. Health Sys.*, No. Civ. A.3:00-CV-1007-P, 2003
WL 22255677, at *10 (N.D. Tex. Sept. 30, 2003) (finding further investigation should have been
performed before summary suspension regarding the supposed negligent care over numerous patients).
Based on the foregoing, the Medical Executive Committee's investigation was adequate to justify its
belief a temporary suspension "was appropriate in the interest of protecting patients and providing time
for 'an investigation . . . to determine the need for a professional review action.'  No more was
required." *Schindler v. Marshfield Clinic*, No. 05-C-705-C, 2006 WL 2944703, at *14 (W.D. Wis. Oct.
12, 2006) (quoting 42 U.S.C. § 11112(c)(1)(B)).

Plaintiffs' arguments that later committee meetings were performed without a sufficient inquiry
into the facts, or that they proceeded without a reasonable belief their actions were warranted, are also
unavailing.  As noted above, the Departmental Action Committee heard testimony from the relevant
medical personnel familiar with Dr. Johnson's treatment of RM.  The Fair Hearing Committee allowed
Dr. Johnson, aided by counsel, to present evidence and argue his case.  The Hospital also allowed Dr.
Johnson an appeal to an Appellate Review Body which found the lower committee findings valid.  Thus,
like the Medical Executive Committee's initial suspension, the peer review process after summary
suspension was undertaken pursuant to a sufficient gathering of facts and the reasonable belief that
action was warranted.

Plaintiffs further maintain that, in light of Dr. Johnson's long medical practice, revocation of his
privileges based on the death of a single patient in his care should be viewed as unreasonably harsh.  The
overly harsh punishment, Plaintiffs contend, casts doubts on whether Defendants' reasonably believed

20

their actions were warranted.  Here, Plaintiffs are essentially disagreeing with Defendants' judgment concerning the propriety of Dr. Johnson's  medical decisions and the appropriate level of punishment that should have been levied.  However, "[t]he role of the federal courts 'on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges.'"  *Bryan v. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1337 (11th Cir. 1994) (quoting *Shahawy v. Harrison*, 875 F.2d 1529, 1533 (11th Cir. 1989)).  Indeed, "[t]he intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise."  *Bryan*, 33 F.3d at 1337.  Thus, Plaintiffs arguments are unavailing.

Plaintiffs also contend Defendants' peer review was based on false and misleading documents which were prepared without knowledge of all of the relevant facts.  The evidence indicates the contrary: Defendants relied on evidence that was prepared based on information provided by the doctors, nurses and medical personnel who were closest to Dr. Johnson's alleged incompetent care.  However, even assuming the evidence used to support Defendants' decisions to suspend Dr. Johnson's privileges was flawed, such an objection does not support Plaintiffs' contention that Defendants failed to make reasonable efforts to obtain the relevant facts and act upon a reasonable belief their actions were warranted.  *See Mathews v. Lancaster Gen. Hosp.*, 883 F. Supp. 1016, 1032 (E.D. Pa. 1995).  Moreover, the fact that, at every stage of review, the various peer review committees found Dr. Johnson's acts and omissions warranted suspension and eventual revocation of his privileges supports the conclusion that Defendants complied with sections 11112(a)(2) & (4).  *See Van v. Anderson, M.D.*, 199 F. Supp. 2d 550, 573-74 (N.D. Tex. 2002).  Plaintiffs again assert allegations of conspiracy and personal bias, but as repeatedly noted above, such allegations do not overcome the presumption Defendants acted in

accordance with HCQIA § 11112(a).

The record indicates that at all stages of Dr. Johnson's peer review, Defendants made reasonable efforts to obtain the relevant facts and acted upon a reasonable belief that their actions were warranted. Thus, no issue of material fact remains as to whether Defendants' actions complied with sections 11112(a)(2) & (4). The Court next discusses whether Defendants satisfied the final remaining provision, section 11112(a)(3) of the HCQIA.

### C. Adequate Notice and Hearing

Plaintiffs next maintain Defendants are precluded from HCQIA immunity because they failed to provide Dr. Johnson with the due process required by section 11112(a)(3). The HCQIA requires adverse action be taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3). Although peer reviewers only need provide "other procedures as are fair to the physician under the circumstances," a health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) if the following conditions are met:

> (1) Notice of proposed action. The physician has been given notice stating-
>> (A) (i) that a professional review action has been proposed to be taken against the physician,
>> (ii) reasons for the proposed action,
>> (B) (i) that the physician has the right to request a hearing on the proposed action,
>> (ii) any time limit (of not less than 30 days) within which to request such a hearing, and
>> (C) a summary of the rights in the hearing under paragraph (3).
> (2) Notice of hearing. If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating-
>> (A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and
>> (B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.
> (3) Conduct of hearing and notice. If a hearing is requested on a timely basis under paragraph (1)(b)-

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)-

> (i) before an arbitrator mutually acceptable to the physician and the health care entity,
>
> (ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or
>
> (iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician involved has the right-

> (i) to representation by an attorney or other person of the physician's choice,
>
> (ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,
>
> (iii) to call, examine, and cross-examine witnesses,
>
> (iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and
>
> (v) to submit a written statement at the close of the hearing; and

(D) upon completion of the hearing, the physician involved has the right-

> (i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and
>
> (ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3).

42 U.S.C. § 11112(b).

Plaintiffs maintain Defendants do not meet section 11112(a)(3)'s requirements because they did not provide Dr. Johnson with notice and a full hearing with counsel present before the Medical Executive Committee's initial March 25, 2004 decision to summarily suspend Dr. Johnson's privileges pending further investigation.  At the heart of Plaintiffs' argument is the contention that here, more than one adverse peer review action occurred: (1) the summary suspension of Dr. Johnson's privileges on

March 25, 2004, and (2) the later hearings that resulted in the revocation of Dr. Johnson's privileges.[76]
Relying on *Poliner v. Texas Health Systems*, 239 F.R.D. 468 (N.D. Tex. 2006), Plaintiffs claim the
"taint" from the improperly executed March 25, 2004 suspension cannot be removed by the subsequent
proceedings.

The HCQIA, however, does not require the procedures referred to in section 11112(a)(3) "in the
case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during
which an investigation is being conducted to determine the need for a professional review action."  42
U.S.C. § 11112(c)(1)(B).  The Medical Executive Committee suspended Dr. Johnson's privileges on
March 25, reconsidered its decision at Dr. Johnson's request on April 1 and the Departmental Action
Committee voted to continue suspension and recommend revocation of Dr. Johnson's privileges on
April 7.  Defendants argue that, at this point, "the need for a professional review action" to revoke Dr.
Johnson's privileges was determined.  Thus, Defendants contend the investigation process was complete
within the 14 days required by section 11112(c)(1)(B) and the March 25, 2004 Medical Executive
Committee meeting is not subject to the requirements of section 11112(a)(3).  The Court agrees.  The
Court concludes that after 13 days, during which an investigation was being conducted, the need for a
professional review action to consider the revocation of Dr. Johnson's privileges was determined.  The
Court notes the HCQIA does not indicate with precision how a lower level investigative committee
would "determine the need for a professional review action."[77]  However, a recommendation from such
a committee to revoke a physician's privileges seems, on its face, a sufficient determination for the need

---

[76] *See* Dkt. No. 102 at pp.23-27.

[77] The HCQIA's legislative history indicates section 11112(c)(1)(B)'s due process exception is "not meant to
provide a back door for harassment of physicians through *repeated* short-term suspensions or *interminable investigations
never leading to a professional review action.*"  *See* H.R. Rep. 99-903, reprinted at 1986 U.S.C.C.A.N. 6384, 6394
(emphasis added).  Here, the Court finds it clear that Defendants did not subject Dr. Johnson to repeated, short-term
suspensions as a back door for harassment, nor did they engage in interminable investigations that never led to a peer
review action.

for a professional review action.

Plaintiffs contest this method of calculating the date for when Defendants determined the need for a professional review action.  Plaintiffs contend the "end date" for Dr. Johnson's summary suspension should be identified as April 22, 2004, the date the Medical Executive Committee *adopted* the Departmental Action Committee's recommendation that a professional review action be initiated and recommended such an action to the Board of Directors.  This would enlarge Dr. Johnson's suspension to 28 days and thus section 11112(a)(3)'s requirements would apply to the March 25, 2004 meeting.  Although the Court does not agree with Plaintiffs' method of determining the date on which the need for a professional peer review action was determined, even if it were to adopt Plaintiff's position, another statutory provision applies to exclude the March 25, 2004 meeting from the due process requirements of section 11112(a)(3).

Section 11112(a)(3)'s procedures need not be followed during a summary suspension period when "failure to take such an action *may* result in an imminent danger to the health of any individual." 42 U.S.C. § 11112(c)(2) (emphasis added).  The Fifth Circuit has observed that "[w]hen determining the amount of process constitutionally due [a physician] prior to [a summary suspension] of his privileges, the key question is not whether [the physician] was actually a danger, but whether the [committee implementing the suspension] *had reasonable grounds for suspending him* as a danger." *Patel v. Midland Mem'l Hosp. and Med. Ctr.*, 298 F.3d 333, 343-44 (5th Cir. 2002) (emphasis added); *see also Austin v. McNamara*, 731 F. Supp. 934, 941-42 (C.D. Cal. 1990) (applying a reasonableness standard to a medical committee's decision to summarily suspend a physician's privileges).  Based on the purportedly negligent treatment of RM, the Court has little trouble finding Dr. Johnson's summary suspension was appropriately based on the reasonable belief he failed to care for a patient and thus may

have represented an imminent danger to the health of an individual.[78]  Thus, the March 25, 2004 Medical

Executive Committee meeting is not subject to the requirements of section 11112(a)(3) and the Court

finds no merit in Plaintiffs' contention Dr. Johnson was entitled to numerous separate investigations and

hearings in order to fulfill section 11112(a)(3)'s requirements.[79]

Plaintiffs also challenge the general due process afforded during later Medical Executive

Committee meetings, the Departmental Action Committee Meeting, the Fair Hearing Committee

meetings and the appellate review process.[80]  Plaintiffs allege the various committee members were

"hand picked" and Dr. Johnson had no input as to their selection.[81]  Plaintiffs, however, do not cite, nor

can the Court otherwise identify, any authority finding a physician subject to a peer review has such

rights.  To the contrary, other courts have recognized "nothing in the [HCQIA] requires that a physician

be permitted to participate in the review of his care."  *Egan v. Athol Mem'l Hosp.*, 971 F. Supp. 37, 43

(D. Mass. 1997) (quoting *Sklaroff v. Allegheny Health Educ. Research Found.*, No. Civ. A. 95-4758,

1996 WL 383137, at *8 (E.D. Pa. July 8, 1996).  Plaintiffs maintain the April 1, 2004 Medical Executive

Committee meeting and April 7, 2004 Departmental Action Committee meeting were held in violation

---

[78] Other courts have gone as far as to conclude a finding that the peer reviewer's actions were taken in a reasonable belief the action furthered quality healthcare necessitates a finding that a summary suspension was taken to prevent the possibility the physician could harm an individual.  *See Peyton v. Johnson City Med.*, 101 S.W.3d 76, 88 (Tenn. Ct. App. 2002) ("In light of our conclusion above that the revocation of [the plaintiff's] privileges was undertaken in a reasonable belief "that the action was in the furtherance of quality health care", we must likewise conclude the summary suspension . . . was taken because the failure to do so may have resulted in an imminent danger to the health of an individual."); *see also Harris v. Bradley Mem'l Hosp. and Health Ctr., Inc.*, No. HHBCV020516962S, 2007 WL 2570427, at *11(Conn. Super. Ct. Aug. 20, 2007) (adopting the *Peyton* court's reasoning).

[79] Like the March 25, 2004 Medical Executive Committee meeting, the various committee meetings surrounding the investigation of Dr. Johnson's treatment of RM are not subject to  the procedures mandated by section 11112(a)(3).  Thus, Plaintiffs' claims that the April 1, 2004 Medical Executive Committee meeting, the April 7, 2004 Departmental Action Committee Meeting and the April 22, 2004 Medical Executive Committee meeting failed to comply with section 11112(a)(3) are unavailing.

[80] Dkt. No. 102 at pp.10-17, 23-27.

[81] *Id.*

of the HCQIA because Dr. Davis, the Hospital's Vice President of Medical Affairs, and Mr. Donnell, the Hospital attorney, sat in on the meetings "as a resource."[82]   Plaintiffs again cite no authority prohibiting such a practice and the Court thus need not consider Plaintiffs' contention further.   Plaintiffs contend the Fair Hearing Committee Officer, DeWitt Alsup ("Alsup"), was an improper individual to preside over the Fair Hearings.[83]   However, the HCQIA only requires the hearing be held "before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved."  42 U.S.C. § 11112(b)(3)(A)(ii).  Plaintiffs have not brought forth any evidence indicating Alsup was in direct economic competition with Dr. Johnson.[84]   Plaintiffs also argue Alsup's limitation of their cross-examination of witnesses and testimony during the hearings deprived Plaintiffs of the due process mandated by the HCQIA.[85]   These limitations, however, are accounted for under the statute, which provides a doctor only has "the right . . . to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law."  42 U.S.C. § 11112(b)(3)(C)(iv); *Bhatt v. Brownsville Gen. Hosp.*, No. 03-1578, 2006 WL 167955, at *26 n.9 (W.D. Pa. Jan. 20, 2006). The Court concludes that following Dr. Johnson's March 25, 2004 summary suspension, Defendants provided him with "subsequent notice and hearing or other adequate procedures."  42 U.S.C. § 11112(c)(2).  Moreover, the Court finds the procedures set forth in section 11112(b) were met during the Fair Hearing Committee hearings and appellate review.

Plaintiffs spend much of their Response to Defendants' Motion for Summary Judgment (Dkt.

---

[82] *Id.* at p.11; *see also* Medical Executive Committee April 1, 2004 Attendance and Minutes, Dkt. No. 92, Ex. M; Departmental Action Committee April 7, 2004 Attendance and Minutes, Dkt. No. 92, Ex. P.

[83] Dkt. No. 102 at p.16.

[84] Plaintiffs point out Alsup was an attorney who worked on the merger between Christus Spohn and the Nueces County Hospital District.  *Id.*  However, this fact does not transform Alsup into a professional in "direct economic competition" with Dr. Johnson.

[85] *Id.* at pp.25-27.

No. 102) arguing Defendants' peer review process "fails to comply with even minimal notions of fairness."[86]  Although Plaintiffs argue at length that the process offers little procedural protection for accused physicians and is thus fundamentally unfair, they cite no case or statutory provision in support of their arguments.  Defendants complied with the requirements of the HCQIA and are thus "deemed" to have met the third prong of the HCQIA's immunity test.  Moreover, courts have found peer review administered under similar procedures and standards to be fair under the HCQIA.  *See, e.g. Bryan v. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1325-26, 1335-36 (11th Cir. 1994).

In order to rebut the presumption Defendants met the standards necessary for section 11111(a)'s protection, Plaintiffs also at times argue that Defendants violated their own Medical Staff Bylaws.  The HCQIA, however, does not explicitly require compliance with such bylaws and the Court is not convinced that Defendants, individually or collectively, substantially deviated from their relevant internal rules.

Additionally, the Court notes that even "'if other procedures are followed, but are not precisely of the character spelled out in [section 11112(b)], the test of 'adequacy' may still be met under other prevailing law.'" *Monroe v. AMI Hosps. of Tex., Inc.*, 877 F. Supp 1022, 1029-30 (S.D. Tex. 1994) (citing H.R. Rep. No. 903 at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6393).  The HCQIA only requires the peer review action be taken "after adequate notice and hearing procedures are afforded to the physician involved or *after such other procedures as are fair to the physician under the circumstances*." 42 U.S.C. § 11112(a)(3) (emphasis added); *see also Smith v. Ricks*, 31 F.3d 1478, 1487 (9th Cir. 1994) (noting the defendants' "procedures either fit into [section 11112(b)(3)] or are so close . . . that no reasonable jury could find [the plaintiff] rebutted the presumption that the procedures were adequate.");

---

[86] *Id.* at p.4.

28

*Mathews v. Lancaster Gen. Hosp.*, 883 F. Supp. 1016, 1034 (E.D. Pa. 1995) (a plaintiff may not "strip a defendant of the protections of the [HCQIA] merely by failing to complete the entire scope of review procedures available to him").  The Court finds that, when confronted with the record present in this case, no jury could reasonably conclude Defendants failed to afford Dr. Johnson the notice and hearings required by section 11112(b) or that were fair to him under the circumstances.

### D. HCQIA Conclusion

Plaintiffs have not raised genuine issues of material fact that rebut the presumption that Defendants' actions were taken 1) in the furtherance of quality health care, 2) after a reasonable effort to obtain the facts, 3) after adequate notice and hearing procedures and 4) in the reasonable belief that their actions were warranted by the facts known.  Defendants are therefore entitled to the immunity provided by the HCQIA and have a complete defense against all of Plaintiffs' causes of action except for Dr. Johnson's section 1981 discrimination claim.  Thus, with the exception of his section 1981 claim, addressed below, summary judgment is granted.

## II.  Immunity Under State Law for Peer Review Actions

In addition to the immunities provided for under the federal law, the HCQIA allows states to provide greater protection to medical review participants.  *See Van v. Anderson, M.D.*, 199 F. Supp. 2d 550, 574 (N.D. Tex. 2002) (citing *Roe v. Walls Reg'l Hosp., Inc.*, 21 S.W.3d 647, 652 (Tex. App.—Waco 2000, no pet.).  The HCQIA's section 11115(a) specifically allows for the application of state law in excess of the federally mandated protections.  Section 11115(a) states:

> Except as specifically provided in this subchapter, *nothing in this subchapter shall be construed* as changing the liabilities or immunities under law or *as preempting or overriding any State law which provides incentives, immunities, or protection for those engaged in a professional review action that is in addition to or greater than that provided by this subchapter.*

42 U.S.C. § 11115(a) (emphasis added).

To this end, Texas enacted the Texas Health Care Quality Improvement Act ("THCQIA"), TEX. OCC. CODE ANN. § 160.010 (Vernon 2001).  Defendants claim immunity under the THCQIA as well as the HCQIA.   The THCQIA establishes immunity from civil liability for:

> (1) a person who, in good faith, reports or furnishes information to a medical peer review committee or the board;

> (2) a member, employee, or agent of the board, a medical peer review committee, or a medical organization committee, or a medical organization district or local intervenor, who takes an action or makes a recommendation within the scope of the functions of the board, committee, or intervenor program, *if that member, employee, agent, or intervenor acts without malice* and in the reasonable belief that the action or recommendation is warranted by the facts known to that person; and

> (3) a member or employee of the board or any person who assists the board in carrying out its duties or functions provided by law.

TEX. OCC. CODE ANN. § 160.010(a)(1)-(3) (Vernon 2001) (emphasis added).

Plaintiffs argue that because Defendants acted with malice, they are not entitled to immunity under Texas law.  Courts apply a presumption that medical peer review actions are taken without malice. *Maewal v. Adventist Health Sys.*, 868 S.W.2d 886, 893 (Tex. App.—Fort Worth 1993, writ denied). Thus, like cases proceeding under the HCQIA, plaintiffs faced with summary judgment under the THCQIA have a higher burden than they would under a normal summary judgment motion.  *Monroe v. AMI Hosps. of Tex., Inc.*, 877 F. Supp 1022, 1030-31 (S.D. Tex. 1994).  "Malice," as used in the context of the THCQIA, means the making of a statement with "knowledge that an allegation is false or with reckless disregard for whether the allegation is false." *Id.*; *see also Maewal*, 868 S.W.2d at 893. "Because there is a presumption of absence of malice, the plaintiff must show *sufficient and specific evidence of malice*."  *Monroe*, 877 F. Supp at 1031 (emphasis added).

Here, Plaintiffs provide no evidence of knowledge of falsity or of reckless disregard for the truth. *See id.*  The evidence Plaintiff proffers is merely a regurgitation of the claims discussed above, including

allegations Defendants failed to perform a proper investigation, did not have a reasonable belief their actions were justified by the facts known to them and conspired to find a scapegoat for RM's death.[87] After a detailed review of the evidence on record, the Court finds no disputed issue of fact material to Defendants' immunity under the THCQIA. Thus, in accord with the immunity granted under the HCQIA, Defendants are immune from liability under the THCQIA. Defendants' motion for summary judgment on the ground they are protected by the THCQIA's immunity provisions is therefore granted.

## III.  Intentional Race Discrimination Under Section 1981

Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (2001).[88] Claims of race-based discrimination brought under section 1981 are governed by the framework applied to claims of employment discrimination brought under Title VII.  *See Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997) (citing *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996)).  Thus, in order to establish a section 1981 violation, Dr. Johnson[89] must first make a showing of a prima facie case of intentional discrimination.  *See Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997) (citing *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)).

To establish a prima facie case for a section 1981 claim, Dr. Johnson must show that (1) he is a member of a racial minority; (2) Defendants had an intent to discriminate on the basis of race; and (3) the discrimination concerned "the making and enforcing of a contract."  *See Bellows*, 118 F.3d at 274

---

[87] Dkt. No. 102 at pp.48-49.

[88] The term "make and enforce contracts" includes the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.  *See* 42 U.S.C. § 1981(b) (2001).

[89] As Defendants point out, Complete Medical, as a business entity, lacks standing to assert a Section 1981 claim.  *See* 42 U.S.C. § 1981 (applying to "[a]ll *persons* within the jurisdiction of the United States" ) (emphasis added). Thus, the Court reads Plaintiffs' section 1981 claims as brought on behalf of Dr. Johnson only.

(citing *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994)).  Dr. Johnson may establish a prima facie case by direct or, more commonly, circumstantial evidence of discriminatory motive.  *Id.* Once Dr. Johnson establishes a prima facie case of discrimination, the burden shifts to the Defendants to articulate a non-discriminatory reason for the adverse action.  *See Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 261 (5th Cir. 2007).  Once Defendants articulate such a reason, the burden once again shifts to Dr. Johnson to show that Defendants' justification for their peer review action was merely a pretext for racial discrimination or that the reason, although genuine, is only one justification for the action and that Dr. Johnson's race was a motivating factor.  *Id.*  To meet his burden, Dr. Johnson must show his race "actually played a role in [the defendants' decision-making] process and had a determinative influence on the outcome."  *Id.* (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

Assuming, *arguendo*, Dr. Johnson has presented a prima facie case of discrimination,[90] Defendants have proffered a legitimate, nondiscriminatory reason for his suspension and the eventual revocation of his privileges.  Specifically, Defendants maintain Dr. Johnson's privileges were suspended

---

[90] It is unclear whether Dr. Johnson's section 1981 claim concerns the making and enforcing of a contract. Courts in the Fifth Circuit consistently find that *medical staff bylaws* do not create a contract between a hospital and a doctor and thus do not give rise to contractual rights or contract-based causes of action. *See, e.g., Monroe v. AMI Hosps. of Tex., Inc.*, 877 F. Supp 1022, 1029 n.5  (S.D. Tex. 1994) (citing *Weary v. Baylor Univ. Hosp.*, 360 S.W.2d 895, 897 (Tex. App.—Waco 1962, writ ref'd n.r.e)); *Van v. Anderson, M.D.*, 199 F. Supp. 2d 550, 562-64 (N.D. Tex. 2002) (citing *Stephen, M.D. v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 887 (Tex. App.—Dallas 2000, no writ)) (both applying Texas law to conclude that medical staff bylaws do not give rise to contractual rights).  Thus, to the extent Dr. Johnson's section 1981 claim rests upon a violation of the Christus Spohn Hospital Corpus Christi Medical Staff Bylaws, it seems clear that no contractual relationship exists between Dr. Johnson and the Hospital, and his section 1981 claim fails. *See* Christus Spohn Hospital Corpus Christi Medical Staff Bylaws, Dkt. No. 102, Ex. H.  However, courts applying Texas law have also found that a contractual relationship can be based on *hospital bylaws* if they provide procedural rights between the physicians and the hospital.  *See Poliner v. Tex. Health Sys.*, No. Civ. A. 3:00-CV-1007-P, 2003 WL 22255677, at *7-8 (N.D. Tex. Sept. 30, 2003) (citing *Gonzales v. San Antonio Methodist Hosp.*, 880 S.W.2d 436, 438 (Tex. Civ. App.— Texarkana 1994, writ denied).  Based on the parties' briefing and the summary judgment evidence, it is not clear to the Court whether Dr. Johnson's complaint concerns a violation of the medical staff bylaws or hospital bylaws.  However, because Dr. Johnson's section 1981 claim fails on other grounds, the Court need not resolve this issue.

and revoked because of concerns for patient safety based on his alleged failure to treat and assess RM.[91] Thus, the burden shifts to Dr. Johnson to show that Defendants' reason was a pretext for discrimination or that Dr. Johnson's race was a motivating factor.

Dr. Johnson's evidence of Defendants' racial discrimination consists of (1) Dr. Acebo's personal opinion that Dr. Johnson may have been treated unfavorably based on his personality, which, in turn, might have been influenced by Dr. Johnson's race;[92] (2) Dr. Johnson's allegation that the Medical Executive Committee was "all white";[93] (3) Dr. Johnson's claim that, when Dr. Johnson first moved to Corpus Christi, Dr. Cleaves did not want to practice in the same building as Dr. Johnson because of Dr. Cleaves' racial animus towards him;[94] (4) Dr. Johnson's belief that the peer review committees punished him more than it would have had he not been African-American;[95] (5) Dr. Acebo's supposed declaration that Christus Spohn needs more Jewish physicians in order to generate greater revenue;[96] and (6) Dr. McCullough's alleged statement that, because of his race, Dr. Johnson "took his place in medical school."[97]  The Court considers this evidence below.

Plaintiff first looks to Dr. Acebo's deposition testimony that other committee members' decisions may have been influenced by Dr. Johnson's personality, which in turn, Dr. Acebo opined,

---

[91] *See* Dkt. No.92 at p. 48.

[92] Dep. of Dr. Acebo at pp.36-40, 47, Dkt. No. 92, Ex. J; Aff. of Dr. Johnson at pp.8-9, Dkt. No. 102, Ex. 1.

[93] Dep. of Dr. Johnson at II:5-17, Dkt. No. 92, Ex. GGG; Dkt. No. 45. at ¶62.

[94] Dep. of Dr. Johnson at II:27-29.

[95] Pls.' Resp. to Def. Doctors' First Set of Interrogs., No. 13, 18 (Sept. 19, 2007), Dkt. No. 92, Ex. EEE.

[96] *Id.*

[97] *Id.*; Aff. of Dr. Johnson at pp.8-9.

might be affected by Dr. Johnson's race.[98]   Dr. Acebo's speculations about the possible relationship between race and personality hardly serve as an indication of Defendants' collective race-based discrimination toward Dr. Johnson.   Similarly, Dr. Acebo's impression regarding the Medical Executive Committee's motivations for suspending Dr. Johnson are "simply opinions, with *no* supporting evidence" that Dr. Johnson was suspended because of his race.   *Jenkins*, 478 F.3d at 262 (emphasis in original).   Dr. Acebo, moreover, only participated in the Medical Executive Committee proceedings, not the three other bodies that convened to consider Dr. Johnson's case.   Statements such as Dr. Acebo's require "too many inferences and presumptions" to reach a conclusion of direct racial bias and are thus insufficient to constitute evidence of discrimination.   *See Van v. Anderson, M.D.*, 199 F. Supp. 2d 550, 557 (N.D. Tex. 2002).

Dr. Johnson also asserts that the issues surrounding his treatment of RM were evaluated by an "all-white" Medical Executive Committee and that the members of the "all-white" committee were racially biased against Dr. Johnson.[99]   All parties agree that the Medical Executive Committee included several Hispanic and Indian doctors.   However, Dr. Johnson—with no evidence outside of his personal opinion—boldly asserts these doctors "consider themselves to be white."[100]   Notwithstanding Dr. Johnson's curious remarks, the racial composition of the Medical Executive Committee fails to support an inference of discrimination because, even assuming the Medical Executive Committee were made up of "all-white" doctors or doctors who "consider themselves to be white," Dr. Johnson fails to show any actions on their part indicating a racial bias against Dr. Johnson.

---

[98] Dep. of Dr. Acebo at pp.36-40, 47.

[99] Dep. of Dr. Johnson at II:5-17; Dkt. No. 45. at ¶62.

[100] Dep. of Dr. Johnson at II:5-17 ("There are only two colors in the world, and that's black and white . . . [if] you're saying that [the Medical Executive Committee members] are not white, you're saying they're black").

The remainder of Plaintiffs' evidence of racial prejudice are a scant few remarks made over the course of numerous years regarding Dr. Johnson and a series of Dr. Johnson's unsubstantiated personal opinions.[101]  The Court finds the remarks too attenuated to raise an inference of Defendants' race-based discrimination toward Dr. Johnson.  In cases involving much stronger evidence of racial prejudice, the Fifth Circuit has held that evidence of such sporadic racial remarks do not raise a genuine issue of material fact to survive summary judgment.  *See, e.g.*, *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 261-62 (5th Cir. 2007) (concluding evidence of numerous racial remarks did not raise a genuine issue of material fact on whether the hospital's summary suspension of the plaintiff was racially motivated); *see also Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir. 1993) ("mere stray remarks, with nothing more, are insufficient to establish a claim of age discrimination ").  At best, the evidence proffered here includes isolated doctors and statements, some of which are far removed in time and place from the peer review, that do not support Dr. Johnson's contention that the adverse action was taken because of a racial prejudice and not Dr. Johnson's treatment of RM.  *Cf. Patel v. Midland Mem'l Hosp. and Med. Ctr.*, 298 F.3d 333, 343-44 (5th Cir. 2002) (quoting *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000)) ("[I]n order for comments in the workplace to provide sufficient evidence of discrimination, they must be '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.'").

---

[101] *See, e.g.*, *id.* at II:27-29 (alleging that, many years ago, Dr. Cleaves told Dr. Johnson he did not want Dr. Johnson practicing in the same building as himself because of animosity toward Dr. Johnson's race); Pls.' Resp. to Def. Doctors' First Set of Interrogs., No. 18 (claiming Dr. Acebo said at one point "we need more 'Jew Doctors at Spohn to make more money'" and  Dr. McCullough remarked that Dr. Johnson "took his place in medical school" because of Dr. Johnson's race); Dep. of Dr. Johnson at II:143-44 (opining white doctors would have been treated differently); and Pls.' Resp. to Def. Doctors' First Set of Interrogs., No. 13 (assessing the sanctions levied against him as "far beyond any punishments that any non-African-American physician ever received at [the Hospital] for the same or similar offense").

The Court has considered Dr. Johnson's allegations of race-based discrimination and finds they largely consist of questionable personal opinions and speculation with little evidentiary support.  Upon a detailed review of the record, the Court finds Dr. Johnson fails to proffer "sufficient evidence of pretext to create a question of fact for the jury that race, rather than [inadequate patient care], was the real reason for his suspension."  *Patel*, 298 F.3d at 342.  Dr. Johnson has failed to show his race "'actually played a role in [Defendants' decision-making] process and had a determinative influence on the outcome.'"  *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 261 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)).  Therefore, Defendants' motion for summary judgment as to Dr. Johnson's section 1981 claim is granted.

**IV. Declaratory Judgment**

Plaintiffs also maintain the HCQIA preempts its Texas Counterpart, the THCQIA, and that the THCQIA violates the "open courts" provision of the Texas Constitution.  Accordingly, Plaintiffs ask the Court for declaratory judgments on these matters.[102]

As to their preemption argument, Plaintiffs contend the HCQIA preempts any provision of state law that would "violate the minimum due process requirements set forth in [42 U.S.C. § 11112]" by allowing immunity under state law even when the due process standards specified by Congress are not satisfied.[103]  However, because the Court has determined Defendants complied with the due process provisions of the HCQIA, no conflict occurs and the Court need not address Plaintiffs' preemption argument further.

Plaintiffs also maintain that the THCQIA violates the "open courts" provision of the Texas Constitution because it allows defendants immunity for the commission of intentional torts.  However,

---

[102] Dkt. No. 45 ¶¶163-66.

[103] *Id.* at ¶164.

because the Court has also found that Defendants are entitled to immunity under the federal peer review immunity statue, it is unnecessary to reach this constitutional question.  *See Van v. Anderson, M.D.*, 199 F. Supp. 2d 550, 574 (N.D. Tex. 2002).

## Conclusion

Based on the foregoing, the Court hereby rules as follows:

1.      Defendants' Motion for Summary Judgment (Dkt. No. 92) is **GRANTED**.

2.      Plaintiffs' requests for declaratory judgment in Count Nine of their Amended

        Complaint are **DISMISSED** as moot.

3.      This case is **DISMISSED** and all other pending motions are **DENIED** as moot.

It is so **ORDERED**

Signed this 8th day of February, 2008.


_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE